**VILLAGE MANAGEMENT, INC., et al., Plaintiffs,**

v.

**HARTFORD ACCIDENT AND INDEMNITY COMPANY, Defendant.**

No. 86C6772.

United States District Court, N.D. Illinois, E.D.

June 12, 1987.

Thomas F. Geselbracht, Hilda C. Contreras, Rudnick & Wolfe, Chicago, Ill., for plaintiffs.

John L. Kirkland, Hinshaw, Culbertson, Moelmann, Hoban & Fuller, Chicago, for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

▮ Village Management, Inc. ("Village") and American National Bank and

Trust Company of Chicago ("Bank") [1] have sued Hartford Accident and Indemnity Company ("Hartford") for a declaration of plaintiffs' rights under Hartford's Comprehensive Business Policy No. 83CBPNM7306 (the "Policy") (Count IV) [2] and for damages because of Hartford's breach of its duty of good faith and fair dealing (Count I), tortious interference with plaintiffs' relationship with their attorneys (Count II) and unfair trade practices (Count III). Hartford has now moved under Rule 12(c) for judgment on the pleadings. For the reasons stated in this memorandum opinion and order, Hartford's motion is granted in part and denied in part.

### Facts [3]

As the "Comprehensive" designation in the Policy's title suggests, Hartford insured plaintiffs from February 22, 1985 until February 22, 1986 for a wide range of risks. Those risks included liability for what the Policy calls "personal injury" (Ex. A at SBF–2), a term defined as (*id.* at SBF–3, emphasis in original [4]):

injury arising out of one or more of the following offenses committed during the policy period:

\* \* \* \* \* \*

(4) discrimination or humiliation not intentionally committed by or at the direction of the *insured* or any executive officer, director, stockholder, partner or member thereof, but only with respect to injury to the feelings or reputation of a natural person.

In addition the Policy provided (Ex. A at SBF–2, emphasis in original (see n. 4)):

[Hartford] shall have the right and duty to defend any suit against the *insured* seeking damages on account of [personal injury], even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation

1. Bank holds legal title to Ontario Place, a mixed-use real estate development in Chicago, Illinois, as trustee under two Illinois land trusts. Village manages Ontario Place for Ontario Place Associates and Erie Place Associates, the land trust beneficiaries.

2. "Ontario Place Associates etal" is the named insured in the Policy, but Hartford does not challenge plaintiffs' status as "insureds" under the Policy. Apparently Hartford also issued another insurance policy (No. 83CBPJH8595) to Ontario Place Associates for an earlier time period (1984–85), but that policy is not at issue here. What *is* at issue, however, is a matter not raised by the litigants but necessary for this Court's consideration. Given the nature of the Illinois land trust concept and the type of insurance coverage in dispute, the real parties in interest (Fed.R.Civ.P. ("Rule") 17(a)) are the trust beneficiaries rather than Bank. This Court correctly presumed (in light of the beneficiaries names, see n. 1) that partnerships are involved, and that means the citizenship of *every* partner—including limited partners, if any (*Elston Investment, Ltd. v. David Altman Leasing Corp.*, 731 F.2d 436, 439 (7th Cir.1984))—is relevant for diversity purposes. Though it seems unlikely any of the real parties in interest on the plaintiffs' side are Connecticut citizens (which would destroy diversity), federal jurisdiction must rest on certainty rather than probability. Accordingly plaintiffs were requested, while this opinion was in the final stages of completion, to file a document reflecting the identity and citizenship of every real party in interest, either by an amendment to the Complaint under Rule 17(a) or in some other appropriate fashion. They have now purported to do so, but their tendered affidavit is defective in two respects:

1. It speaks of "residence" rather than citizenship (the relevant consideration for diversity purposes).
2. It identifies the two "Associates" entities (see n. 1) as limited partnerships, some of whose constituent partners are themselves limited partnerships. *Elston Investment* principles teach all the partners (both general and limited) of those subpartnerships must also be considered in the diversity equation (*NCR Corp. v. Mehlman*, No. 87 C 2951, slip op. (N.D.Ill. Mar. 31, 1987)).

Accordingly plaintiffs are ordered to file a proper document dealing with all factual aspects of the diversity question on or before June 26, 1987.

3. This recitation of facts is drawn from the Complaint's allegations. On Hartford's Rule 12(c) motion all well-pleaded factual allegations are deemed admitted (*Roberts v. Northern Trust Co.*, 550 F.Supp. 729, 730 (N.D.Ill.1982)), and all reasonable inferences from those allegations are drawn in plaintiffs' favor (5 Wright & Miller, *Federal Practice and Procedure: Civil* § 1368, at 693 (1969)). Complaint Exhibits will be cited simply "Ex.—."

4. This was not a matter of emphasis in the normal sense. As insurance policies frequently do, the Policy used boldface type for words that were defined elsewhere in the Policy (thus alerting the reader to terms of art).

and settlement of any claim or suit as it deems expedient. . . .

On July 3, 1985 plaintiffs were sued for injunctive and monetary relief in a class action, *Mabry, et al. v. Village Management, Inc., et al.,* No. 85 C 6093 (N.D.Ill.).[5] *Mabry* charged both race and age discrimination stemming from the adoption and application of a tenant selection policy at Ontario Place.[6] According to the *Mabry* complaint, the current plaintiffs were guilty of intentional discrimination against, and of producing a disparate impact on, blacks who had applied or would apply for federally subsidized apartments (Ex. B ¶ 38).[7]

Plaintiffs initially hired the Rudnick & Wolfe law firm to represent them in *Ma-*bry, then tendered defense of the action to Hartford. On September 11, 1985 Hartford responded to Rudnick & Wolfe (Ex. C) by:

1. noting that the Policy would not cover liability for intentional discrimination;

2. saying Hartford was submitting the denial or acceptance of plaintiffs' tender of coverage and defense of the *Mabry* litigation to its Home Office;

3. reserving all rights under the Policy; and

4. advising Rudnick & Wolfe:
   You should continue to protect the record of your clients.

Just a few months later (in a December 30, 1985 letter, Ex. D) Hartford said its

5. Actually *Mabry* sought relief for two classes under Rules 23(a) and 23(b)(2) (Ex. B ¶ 4):

   (a) *Class A.* Class A is defined as all two-person black families consisting of one adult and one child who have applied or will apply or who have sought to apply or will seek to apply for housing subsidized pursuant to 42 U.S.C. § 1437f at the apartment building located at 10 E. Ontario, Chicago, Illinois ("Ontario Place") and who have been or will be denied such housing based upon the Tenant Selection Policy described in ¶ 33, *infra.*

   (b) *Class B.* Class B is defined as all children in all two person families who have applied or will apply or who have sought to apply or will seek to apply for housing subsidized pursuant to 42 U.S.C. § 1437f at Ontario Place, and who have been or will be denied such housing based upon the tenant selection policy described in ¶ 33, *infra.*

   Neither side has specified whether either or both classes was or were certified, but of course one or both must have been (if not, the dispute here would vanish, see n. 16).

6. Ex. B ¶ 33 summarized that policy:
   At all relevant times the Trust and Village Management have applied and continue to apply a tenant selection policy ("Tenant Selection Policy") at Ontario Place under which:

   (a) a two-person family consisting of one adult and one child may not rent a one bedroom Section 8 apartment, but a two person family consisting of two adults may rent a Section 8 one bedroom apartment;

   (b) a two person family consisting of one adult and one child may not rent a one bedroom Section 8 apartment, but a two person family consisting of one adult and one child may rent a market-rate one bedroom apartment;

   (c) a two person family consisting of one adult and one child will not be placed on a waiting list for one bedroom Section 8 apartments;

   (d) the private defendants would assign a one bedroom apartment to a two person family consisting of two adults regardless of whether the family initially sought or applied for a two bedroom apartment but would not assign a one bedroom Section 8 apartment to a two person family consisting of one adult and one child.

7. *Mabry* advanced claims under 42 U.S.C. §§ 1981, 1982 and 2000d (Title VI) and for breach of contract. That last claim characterized the class as third-party beneficiaries of plaintiffs' agreement with the Department of Housing and Urban Development, which prohibits discrimination against prospective tenants with children and discrimination because of a prospective tenant's race. All the other *Mabry* claims required proof of intentional discrimination:

   (a) as to Sections 1981 and 1982, see *Firefighters Local Union No. 1784 v. Stotts,* 467 U.S. 561, 583 n. 16, 104 S.Ct. 2576, 2590 n. 16, 81 L.Ed.2d 483 (1984) and *Phillips v. Hunter Trails Community Ass'n,* 685 F.2d 184, 187 (7th Cir.1982); and

   (b) as to Title VI, see *Cannon v. University of Chicago,* 648 F.2d 1104, 1108–09 (7th Cir. 1981).

   As for the breach of contract claim, though, a showing of disparate impact may well have been enough, because proof of fault or intent is not a necessary element of every breach of contract (*Album Graphics, Inc. v. Beatrice Foods Co.,* 87 Ill.App.3d 338, 350, 42 Ill.Dec. 332, 341, 408 N.E.2d 1041, 1050 (1st Dist.1980)) and because "discrimination" (the conduct covered by the Policy) may be unintentional as well as intentional.

Home Office had completed its review and had now agreed to defend plaintiffs in *Mabry* "for any subsequent and continuing discrimination which is deemed to have occurred within the [P]olicy period[ ]." That reference to "subsequent and continuing" followed a sentence in which Hartford pointed out:

> The dates specified in the [*Mabry*] complaint represents (sic) the onset of the alleged discrimination acts only beginning on June 20, 1983, but do not include reference to any cessation dates.

Hartford concluded by suggesting that plaintiffs communicate with their insurance carrier for prior years so that Hartford, plaintiffs and any other potentially liable insurer could apportion the defense costs.

After that second letter Rudnick & Wolfe began sending its bills for handling the *Mabry* defense directly to Hartford. Hartford, however, failed even to acknowledge those bills. Moreover, except for a January 22, 1986 meeting to discuss the *Mabry* class' demands and the coverage issue, Hartford completely refused to participate in the *Mabry* defense. Plaintiffs repeatedly (and unsuccessfully) demanded that Hartford pay Rudnick & Wolfe and respond to various inquiries about settlement offers. In the face of Hartford's silence, plaintiffs agreed to a settlement with the *Mabry* class August 22, 1986. Hartford has also not answered plaintiffs' request that it pay the initial cost of that settlement. Apparently the *Mabry* litigation is still pending until the class is notified and the settlement is approved.

Plaintiffs filed this action September 9, 1986. Complaint Count IV seeks a declaration of plaintiffs' rights under the Policy—more precisely, a declaration that Hartford has "waived" its Policy defenses because of its refusal to defend the *Mabry* lawsuit. Counts I, II and III ask compensatory and punitive damages under a variety of legal theories:

1. Count I charges Hartford's "refusal to defend" breached its implied obligation of good faith and fair dealing.

2. Count II (the "tortious interference claim") asserts Hartford's refusal to pay Rudnick & Wolfe amounted to tortious interference with the attorney-client relationship between that law firm and plaintiffs.

3. Count III (the "consumer fraud claim") says Hartford's conduct violated the Illinois Consumer Fraud and Deceptive Practices Act (the "Consumer Fraud Act"), Ill.Rev.Stat. ch. 121½, ¶¶ 261 et seq.

Hartford answered the Complaint November 19, 1986, admitting virtually all plaintiffs' factual allegations.

### Rule 12(c) Standards

To prevail on its current Rule 12(c) motion, Hartford must show (*Susman v. Lincoln American Corp.*, 517 F.Supp. 931, 934 & n. 7 (N.D.Ill.1981), quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957) and citing 5 Wright & Miller § 1368):

> beyond doubt that plaintiff[s] can prove no set of facts in support of [their] claim[s] which would entitle [them] to relief.

This opinion will deal with each of plaintiffs' claims in those terms.

### Duty To Defend

If the only thing involved in plaintiffs' duty-to-defend claim were Hartford's obligation for ultimate payment to the lawyers representing plaintiffs in *Mabry*, that issue might have been rendered moot by a post-Complaint (indeed, post-motion) development. Together with its Reply Memorandum, Hartford has submitted photocopies of a letter and check it sent to Rudnick & Wolfe for $57,118.21 in "interim attorney fees." That belated payment to plaintiffs' own lawyers for services in the now-settled litigation might perhaps be considered no different from Hartford's having designated and paid those lawyers in the first instance.

But in plaintiffs' view the duty to defend embraces more than mere post-hoc payment. Their claims are wider-ranging, and it remains necessary to consider the nature and scope of the duty to defend in the first instance. That is so because plaintiffs'

claims rest in part on estoppel notions, and plaintiffs say it is Hartford's wrongful refusal to defend them in *Mabry* that estops Hartford from now raising its policy defenses.[8] As the following discussion reflects, that argument correctly states the general rule, but it ignores a well-established qualification—one that clearly applies to Hartford and the *Mabry* litigation.

■■■ Unless the allegations of a lawsuit against an insured clearly show a claim is beyond the policy coverage, an insurer cannot simply refuse to perform its promise to defend the insured (*Reis v. Aetna Casualty and Surety Co. of Illinois*, 69 Ill.App.3d 777, 782, 25 Ill.Dec. 824, 828–29, 387 N.E.2d 700, 704–05 (1st Dist.1978)). Because the duty to defend is thus broader than the insurer's obligation to pay under the policy, there are situations requiring the insurer to provide a defense against claims despite serious questions as to the ultimate coverage of those claims. If the possibility of non-coverage exists, the insurer must defend under a reservation of rights or seek a declaratory judgment on the coverage issue before the underlying litigation goes to trial (*Trovillion v. United States Fidelity and Guaranty Co.*, 130 Ill.App.3d 694, 700, 86 Ill.Dec. 39, 44, 474 N.E.2d 953, 958 (5th Dist.1985)). If an insurer does neither and wrongfully refuses to defend its insured, the insurer is estopped from later raising non-coverage as a defense to an action on the policy (*id.*).

■■■ *Mabry*'s allegations were at least potentially within the Policy's coverage. Plaintiffs were charged with discrimination against the class both in intentional terms *and* because of the disparate impact of plaintiffs' actions (Ex. B ¶ 38). Those assertedly discriminatory actions were ongoing, beginning in 1983 and continuing while *Mabry* was pending. Thus plaintiffs were accused of conduct that included unintentional discrimination occurring during the

Policy period—and hence of "offenses" covered by the Policy. Hartford therefore had a duty to defend plaintiffs in *Mabry*.[9]

Hartford urges it was not obligated to defend because the only relevant allegedly discriminatory act took place before the Policy period. But the dating of discriminatory acts for purposes of insurance coverage (a difficult question addressed later in this opinion) is hardly a well-defined area of the law. That very uncertainty negates any conclusion that there was *clearly* no Policy coverage for the *Mabry* claims.

■ At the same time, there is no gainsaying the existence of serious questions as to such coverage. That being so, Hartford was entitled to (as it did, see Ex. D) reserve its right to contest coverage later, even while it agreed currently to afford plaintiffs a defense in *Mabry*. Despite that reservation of rights, plaintiffs contend Hartford's later refusal to communicate with Rudnick & Wolfe and to pay the firm's bills was itself a breach of the duty to defend, creating an estoppel against Hartford's interposition of its Policy defenses in this lawsuit. Plaintiffs are wrong.

*Mabry*'s claims not only raised potential questions of Policy coverage but also created a conflict of interest between plaintiffs and Hartford. Had plaintiffs been found guilty *only* of intentional discrimination against the *Mabry* class or classes, plaintiffs would have been rendered liable with no right to look to Hartford for indemnification. Thus it would have been in Hartford's own best interests—but certainly *not* in plaintiffs'—to present the case in a way pointing toward intentional discrimination.

In that type of conflict-of-interest situation, an insurer still has a duty to defend its insureds, but (as plaintiffs themselves recognize) the insureds have a right to be represented by their own independent coun-

---

8. Both sides use "waiver" and "estoppel" interchangeably, though the terms are not synonymous (*American Home Assurance Co. v. Dykema, Gossett, Spencer, Goodnow & Trigg*, 811 F.2d 1077, 1081–82 n. 6 (7th Cir.1987)). Here estoppel is the right label.

9. Where a lawsuit poses multiple claims, some within and some outside the scope of policy coverage (see n. 7), the insurer has a duty to defend (*Ohio Casualty Insurance Co. v. Bazzi Construction Co.*, 815 F.2d 1146, 1147 (7th Cir. 1987) and Illinois cases cited there).

sel (*Maryland Casualty Co. v. Peppers*, 64 Ill.2d 187, 198–99, 355 N.E.2d 24, 30–31 (1976)). As *Thornton v. Paul*, 74 Ill.2d 132, 152, 23 Ill.Dec. 541, 549, 384 N.E.2d 335, 343 (1979) explains:

> [W]hen there is a conflict of interests, as in the present case, the insurer should not be obligated or permitted to participate in the defense of the case. Its obligation to provide a defense should be satisfied by reimbursing the insured for the costs of the defense.

Under such circumstances, then, Hartford's only obligation is to reimburse plaintiffs for their defense costs, not to defend them directly. Logically that bar against Hartford's participation in the actual defense should also extend to settlement negotiations, for Hartford could reasonably have perceived its own interests as best served by either (1) a settlement predicated on an admission of plaintiffs' intentional discrimination or, failing that, (2) a trial resulting in a finding of intentional discrimination by plaintiffs.

In light of that inherent conflict, plaintiffs and *their* attorneys—who owe undivided loyalty to plaintiffs—had to bear sole responsibility for the defense of the *Mabry* litigation, including the question of settlement. Hartford did not have to (and indeed could not in good conscience) advise them on that question. Its only duty-to-defend obligation is to reimburse plaintiffs for the costs of their defense.

■ Plaintiffs also urge Hartford's "failure" to seek a declaratory judgment further evidences a breach of its duty to defend. True enough, obtaining a declaration of rights on any coverage issues before the trial of the underlying litigation is normally the proper alternative for an insurer that chooses not to defend under a reservation of rights. But *Maryland Casualty* and *Thornton* teach that alternative

should *not* be pursued when a conflict of interest prevents the insurer from actually undertaking its insured's defense. When it would be necessary to decide an issue crucial to the insured's liability in the underlying case in order to resolve the coverage issue, any declaratory judgment on the coverage issue could create issue preclusion ("collateral estoppel") problems. That has led the Illinois cases to rule out such actions as "premature" (see, e.g., *Thornton*, 74 Ill.2d at 156–57, 23 Ill.Dec. at 544, 384 N.E.2d at 346, approving and following *Maryland Casualty*).

In *Mabry* a finding of intentional discrimination would indeed have been crucial to plaintiffs' liability on several of the class claims (see n. 7). That identical finding would be equally crucial to one of Hartford's policy defenses. And such an identity of issues would call the *Thornton* principle into play.

■ Hartford does, however, have an additional policy defense (in fact, the only one it raises in this case): its claim that plaintiffs' alleged discriminatory act—a single act—antedated the Policy's coverage period. Precisely when the discriminatory act or acts occurred for insurance coverage purposes was not at all critical to the *Mabry* claims—but tendering that issue in an earlier declaratory judgment action would have required Hartford to split its policy defenses, raising one before the *Mabry* litigation but saving another for later. Even if that were permissible in jurisprudential terms,[10] Hartford was surely not forced to do so.[11]

In sum, Hartford exercised a permissible option when it decided to provide plaintiffs with a defense in *Mabry* while reserving its rights to contest coverage. Because that reservation of rights created a conflict of interest between Hartford and plaintiffs,

---

**10.** At a minimum, such a procedure (splitting a cause of action) appears questionable. This Court need not, however, decide the matter to resolve the issues here.

**11.** Imposing such a requirement on Hartford would not serve the interests of judicial economy. *Mabry* would have continued as pending litigation regardless of the outcome of any prior

declaratory judgment action between Hartford and plaintiffs. On the other hand, had *Mabry* gone to trial the question of plaintiffs' intent would necessarily have been resolved. That same element of policy coverage would then have been decided, and a declaratory judgment on the issue would thus have been avoided.

Hartford was merely required to provide a defense by reimbursing plaintiffs for the cost of their independent defense.

■ Nor are plaintiffs right in contending Hartford is estopped from raising any policy defenses because it did not honor its obligation to "reimburse" plaintiffs for their defense costs by paying Rudnick & Wolfe directly during the pendency of the *Mabry* litigation. Nothing in *Thornton* or *Maryland Casualty* literally compels such a conclusion. After all, *Thornton* speaks of "reimbursing the insured," and in normal usage that connotes restoring money laid out by the insured in the first instance.[12]

■ Of course it is essential to remember the Policy obligation itself is *not* phrased as one of reimbursement: Instead it is "to defend any suit against the insured." "To defend" necessarily means to provide an effective defense, and if for any reason an end-of-the-case reimbursement arrangement—or even one requiring the insured to lay out the lawyers' fees and expenses in the first instance, then to seek repayment from the insurer—defeated that purpose (for example, if the insured lacked the funds to finance its lawyers' requirements) the insurer would have breached its contract. No doubt a better reading of the obligation "to defend" (or even to "reimburse" or "underwrite") would call for a pay-as-you-go funding by the insurer, to obviate any such problems. But that is not the *only* permissible reading, let alone the only reading mandated by the case law.[13]

■ In short, this Court does hold Hartford's duty "to defend" the *Mabry* litigation meant, in these circumstances, the duty to reimburse plaintiffs' litigation costs (including the fees and expenses of plaintiffs' independent counsel) as they were and are incurred. That is a fair reading of the implications from the Policy language and the Illinois case law.

It is unnecessary to decide for the present whether that meant plaintiffs had to take the formal step of making each payment, then demanding "reimbursement," or whether a demand for direct payment to the lawyers was enough. That question is one the parties really have not given their full attention. But what *is* decided here is that if Hartford did breach its duty to defend by making no payment until its 1987 check for some $57,000 in "interim attorney fees," the only consequence of such a breach would be its having to pay any damages proved to have been caused by that breach. It would be both unnecessary and unfair to sanction any such breach by holding Hartford estopped from raising any policy defenses in this action.[14]

### Insurance Coverage for the Mabry Settlement

Although plaintiffs thus lose the battle over estoppel, that does not necessarily mean they lose the coverage war. To this point Hartford has only won the procedural right to *assert* any policy defenses it may have against plaintiffs' claim of indemnity for whatever they have to pay under the

---

12. *Murphy v. Urso*, 88 Ill.2d 444, 454, 58 Ill.Dec. 828, 833, 430 N.E.2d 1079, 1084 (1982) uses "underwrite" rather than "reimburse" in describing an insurer's duty to defend in a conflict situation. That different terminology leads to no different conclusion from the one reached in this opinion.

13. *Burd v. Sussex Mutual Insurance Co.*, 56 N.J. 383, 390, 267 A.2d 7, 10 (1970)—which *Thornton*, 74 Ill.2d at 154, 23 Ill.Dec. at 550, 384 N.E.2d at 344 cites and quotes—does suggest an insurer could wait until its policy defenses were resolved before reimbursing its insured. But that notion is hard to reconcile with the concept that the duty to defend is not at all coextensive with policy coverage. More importantly, no Illinois case (including *Thornton*) has had to speak directly to the problem discussed here. Accordingly it is simply wrong to say (as Hartford's counsel does) that the cases' use of the word "reimburse" means the insurer has a one-time and not a periodic payment obligation. After all, the ordinary sense of the word really cuts the other way.

14. Such unfairness would be aggravated by the fact that the duty announced here was not clearly articulated by existing case law, so Hartford should not be compelled to have acted at its peril—at least to the extent of losing otherwise valid defenses to Policy coverage.

*Mabry* settlement. It remains to consider the substance of any such defenses.

In this action Hartford asserts only one policy defense. It argues the Policy does not cover liability for the discrimination alleged in *Mabry* because the injuries resulting from that discrimination were caused by a single discriminatory "offense," which occurred before the Policy's effective date.[15]

As with any insurance coverage question, the first order of business is to examine the language of the Policy itself. Hartford gets no farther, for its defense is wrecked on those policy-language shoals.

Both parties agree the Policy is what is commonly called an "occurrence" policy, although given the Policy language quoted at the beginning of the "Facts" section of this opinion, an "offense" policy would be more accurate and (as will become evident later) less confusing. Coverage depends on whether one or more "offenses" has or have been committed between February 22, 1985 and February 22, 1986, the Policy period. Although the Policy does not define "offense" in generic terms, it gives that term its content by listing the types of "offenses" coverage (including "discrimination ... not intentionally committed").

In a wholly separate endorsement to the Policy (captioned "Amendment—Limits of Liability (Single Limit)," Ex. A Form L–4152–0), Hartford limits its exposure to the *Mabry* "personal injury" claims to $1 million for "each occurrence." "Occurrence" too is left undefined as such, but the same endorsement does provide (*id.*, emphasis in original (see n. 4)):

> For the purpose of determining the limit of the company's liability, all [personal injury] *damage* arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one *occurrence*.

Hartford urges that same "one occurrence" concept should also apply to the term "offense"—that plaintiffs' adoption of their tenant selection policy in 1983 should be considered the only "offense" for purposes of insurance coverage.[16] Because that "offense" antedated the Policy period, Hartford concludes the Policy does not provide coverage for any part of the *Mabry* settlement, which compensates for the personal injury caused by that offense. Hartford relies on *Appalachian Insurance Co. v. Liberty Mutual Insurance Co.*, 676 F.2d 56 (3d Cir.1982) as "controlling" in that respect. Hartford is, to put it bluntly, dead wrong.

**15.** There is a serious question whether Hartford can even advance that defense in this litigation. When it wrote its reservation-of-rights letters (Exs. C and D), the only coverage question Hartford identified was the Policy's non-coverage of *intentional* discrimination. There was no hint of a total denial of coverage on the theory identified in the text. Quite the contrary was true of Ex. D in several respects:

    1. It referred to "discriminatory acts" in the plural, not to a single act.

    2. It spoke of the *Mabry* complaint as having specified the onset dates but not "any cessation dates" of those discriminatory acts.

    3. It agreed to defend plaintiffs "for any subsequent and continuing unintentional discrimination which is deemed to have occurred within the [P]olicy period[ ]."

    4. It urged plaintiffs to put their prior insurance carrier on notice because "there should be an apportion (sic) of defense costs and attorney fees"—obviously inappropriate if a *single* discriminatory act were involved.

All those things are totally inconsistent with Hartford's current argument. Although Hartford's failure expressly to reserve its "one occur-rence" policy defense in its letters is not an automatic waiver of that defense (*Ladd Construction Co. v. Insurance Co. of North America*, 73 Ill.App.3d 43, 49–50, 29 Ill.Dec. 305, 310, 391 N.E.2d 568, 573 (3d Dist.1979)), such a waiver could certainly be implied here where the omitted policy defense is inconsistent with those expressly reserved (*National Tea Co. v. Commerce and Industry Insurance Co.*, 119 Ill.App.3d 195, 205, 74 Ill.Dec. 704, 711–12, 456 N.E.2d 206, 213–14 (1st Dist.1983)). Because of this opinion's ruling on the merits, this Court need not resolve that question, or the related question whether plaintiffs may themselves have waived such a waiver argument by not asserting it in their motion.

**16.** Hartford also points out—this time correctly—that all the named plaintiffs in *Mabry* were 1983 applicants to Ontario Place, so they had suffered the claimed discriminatory effect of the tenant selection policy before the Policy took effect. That however is an irrelevancy, because the controversy here relates to class members (not the named plaintiffs) who sustained such injuries later—during the Policy period (see n. 5).

To be sure, *Appalachian* addressed an issue much like that presented here (676 F.2d at 58):

> [W]hether a liability insurer must provide coverage for losses its insured incurred in the settlement of class action litigation involving sex discrimination in employment where the insured's discriminatory conduct originated before the effective date of coverage but had an impact on class members before and after that date.

But the vital difference between that case and this one is that *Appalachian* involved an "occurrence" policy both in customary insurance parlance *and* literally: It covered "liability ... for damages on account of ... personal injuries ... caused by or arising out of each occurrence happening anywhere in the world." Then the policy went on to define "occurrence"—the very term that prescribed the scope of coverage—in a way that made the "one occurrence" concept part of the coverage limitation (676 F.2d at 59 n. 8):

> The policy defined occurrence as
>
> [A]n accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury, property damage or advertising liability during the policy period. All such exposure to substantially the same general conditions existing at or emanating from one premises location shall be deemed one occurrence.

With that specific coverage prescription before it, the *Appalachian* court held the insured employer's adoption of the sex-dis-criminatory policy (which preceded the policy period) had been the "one occurrence" whose effects had been felt thereafter—including, in part, the injury to some class members during the policy period. That meant a denial of coverage for such later-sustained injuries.

Quite apart from the obvious fact that a Court of Appeals decision elsewhere is never really "controlling," [17] the crucial distinction here lies in the totally different role the "one occurrence" provision plays in the Policy. This is, after all, a contract case, and it is the *contract* that is truly "controlling." All the "occurrence" standard does in the Policy—the only context in which the term is used at all—is to specify the limits of liability. And all the "one occurrence" standard does is to define a special case in that respect, applying a single limit to what might otherwise be considered multiple "occurrences" (see our Court of Appeals' opinion in *American Home*, 811 F.2d at 1084).

What that means is that plaintiffs' tenant selection policy and all its resultant injuries—whenever sustained—are "one occurrence" for purposes of limiting Hartford's maximum exposure under the Policy to $1 million.[18] But there is nothing at all to suggest that the same notion should be transported over to an area of the Policy where Hartford itself did not choose to place it—to the coverage provision stated in terms of "offenses." Coverage is expressed there in plural and not singular terms:

17. Under our jurisprudential system, only decisions from our Court of Appeals and the Supreme Court (and, in diversity cases, from the relevant state court system) are "controlling." Opinions of the Third Circuit merit respectful consideration, no more. And that is certainly true where that court is itself deciding a diversity case—in *Appalachian*, under Massachusetts law (although as *Appalachian* noted, 676 F.2d at 60 n. 10, it found no Massachusetts law to apply and instead relied on "principles ... not limited to Massachusetts law"). This Court too is confronted with a diversity action—one in which neither side has addressed the question of what state's (or states') laws apply. Both sides cite Illinois case law when available, and of course the insured's conduct is entirely Illinois-based

(though that does not necessarily control either). In any event, the approach taken by the litigants brings into play the doctrine of *National Association of Sporting Goods Wholesalers, Inc. v. F.T.L. Marketing Corp.*, 779 F.2d 1281, 1284–85 (7th Cir.1985), and this Court too will look to the forum state's (Illinois') substantive law.

18. Two Courts of Appeal have predicted Illinois would adopt that approach to limitation of liability; see *Michigan Chemical Corp. v. American Home Assurance Co.*, 728 F.2d 374, 379–80 (6th Cir.1984); *Denham v. LaSalle-Madison Hotel Co.*, 168 F.2d 576 (7th Cir.1948).

injury arising out of one or more of the following offenses committed during the policy period....

No hint is given that the normal meaning of that language should be changed in the way Hartford urges. Indeed, the strong negative inference from Hartford's own drafting of its own form contract is that its *failure* to insert a "one offense" clause (when it knew very well how to create such a provision if it wanted to) means the normal approach to identifying Policy-covered offenses applies. And that means *each* "personal injury" sustained during the Policy period is a separate "offense," even though many individual injuries may stem from the same course of conduct by the insured—and irrespective of whether the inception of that course of conduct fell within or outside of the Policy period (see *American Home,* 811 F.2d at 1085–86).[19]

That meaning of "offense" seems plain enough from the Policy language taken as a whole. But even if that were not so, the very most Hartford could claim is that its own asserted reading—under which plaintiffs' adoption of the tenant selection policy was the single discriminatory "offense"—is also reasonable. And were *that* so, the term "offense" would at worst be ambiguous (*Joseph v. Lake Michigan Mortgage Co.,* 106 Ill.App.3d 988, 991, 62 Ill.Dec. 637, 639–40, 436 N.E.2d 663, 665–66 (1st Dist. 1982)). And when an insurance contract is ambiguous, it must be construed against the insurer (*National Union Fire Insurance Co. v. Continental Illinois Corp.,* 643 F.Supp. 1434, 1439 (N.D.Ill.1986)).

Accordingly, each time plaintiffs applied their tenant selection criteria to reject a member of the *Mabry* class for Ontario Place tenancy, they committed a discriminatory "offense." Each such offense occurred, for purposes of determining Policy coverage, when the prospective tenant sustained damage (*American Home,* 811 F.2d at 1085; *Appalachian,* 676 F.2d at 61–62): that is, the rejection date.[20] And Hartford is liable for all the injuries sustained by class members so rejected during the Policy period.[21] Hartford must indemnify plaintiffs for the portion of the settlement (assuming its ultimate approval) attributable to those personal injuries (*American Home,* 811 F.2d at 1086–87). Hartford's liability is, however, limited to $1 million because of the "one occurrence" provision.

### *Plaintiffs' Other Claims*

Plaintiffs' claims under Count I, II and III are all premised on Hartford's alleged breach of its contractual duty to defend plaintiffs in *Mabry.* Because the latter issue has not yet been resolved, on this Rule 12(c) motion Hartford's effort to cut plaintiffs off at the pass must be tested as though there were such a contract breach.

Count I charges Hartford's breach of its asserted duty of good faith, a claim preempted by Illinois Insurance Code § 155, Ill.Rev.Stat. ch. 73, ¶ 767 ("Section 155") (*National Union Fire Insurance Co. v. Continental Illinois Corp.,* 652 F.Supp. 858, 860 (N.D.Ill.1986)).[22] Section 155 provides statutory damages for an insurer's

**19.** *American Home* was a diversity case looking to Michigan law. As was true in *Appalachian* (see n. 17), our Court of Appeals found no relevant state law, so it relied on general legal principles.

**20.** *Mabry* claims as damages the difference between the market value of class members' actual housing and that of housing in Ontario Place (Ex. B ¶ 53). Nonetheless, the date of rejection of an applicant, not the later date on which occupancy would have been delivered had there been no rejection, appears the relevant one for Policy coverage purposes.

**21.** Once again it must be remembered such liability is limited to nonintentional discrimina-

tion (a question whose answer is outside the scope of this opinion). But assuming that hurdle is overcome, Policy coverage extends to all injuries sustained by the victims of such discrimination, even injuries accrued after the Policy period. Hartford's Policy does not require that all the *injuries* resulting from an offense committed during the Policy period must also occur during that period (see *Appalachian,* 676 F.2d at 63 n. 16).

**22.** Because this litigation is Chicago-based, the First Appellate District decision in *Combs v. Insurance Co. of Illinois,* 146 Ill.App.3d 957, 100 Ill.Dec. 525, 497 N.E.2d 503 (1st Dist.1986) controls here, just as it did in *National Union,* 652 F.Supp. at 860 & n. 5.

**1378**

vexatious and unreasonable actions in contesting liability under the Policy or delaying settlement of its insured's claim (*Zakarian v. Prudential Insurance Co. of America*, 652 F.Supp. 1126, 1136 (N.D.Ill. 1987)).

 Hartford's refusal to communicate with plaintiffs or to pay their attorneys' fees during the *Mabry* litigation could not be labeled vexatious or unreasonable—a conclusion compelled by this opinion's earlier analysis. At most Hartford did not comport itself the way a business should treat its customers if it wants to keep them. Losing a customer, and not liability under Section 155, is the "sanction" Hartford has risked.

 Although plaintiffs do not make this precise argument, Hartford's assertion of its policy defense in this case, if considered as falling within the scope of Section 155 (see *Zakarian*, 652 F.Supp. at 1136 n. 21), was also neither vexatious nor unreasonable (see *Cummings Foods, Inc. v. Great Central Insurance Co.*, 108 Ill. App.3d 250, 259, 64 Ill.Dec. 108, 115, 439 N.E.2d 37, 44 (4th Dist.1982)). Hartford had every right to assert any legitimate policy defense in this action. Its claim of no coverage because of a single "offense" by plaintiffs before the Policy period, while ultimately unsuccessful, was not frivolous.

 Count II asserts Hartford's nonpayment of the Rudnick & Wolfe bills was a tortious interference with plaintiffs' relationship with their lawyers. That claim must depend on some intentional wrongful act by Hartford without just cause (*Marcus v. Wilson*, 16 Ill.App.3d 724, 729–30, 306 N.E.2d 554, 559 (1st Dist.1973)). Because this Court has not had enough input from the parties to permit that question to be resolved in this opinion, no decision can now be made on the viability of Count II. Before more time has to be devoted to that subject, however, plaintiffs owe some explanation of just how they can claim to have been damaged by the assertedly tortious interference (a seemingly dubious prospect).

 Count III's consumer fraud claim seeks damages for Hartford's "unfair trade practices," principally invoking the Consumer Fraud Act.[23] This time the same complained-of conduct is said to have deprived plaintiffs of what they paid for when they bought insurance from Hartford. This opinion's earlier analysis compels the conclusion that, whatever else may be said of Hartford's conduct, it did not smack of fraud. Count III fails.

### Conclusion

Hartford is entitled to judgment on the pleadings on Complaint Counts I and III. Count II stays alive for the present. As for Count IV, this opinion has defined (so far as is now possible) the circumstances under which, and the extent to which, Hartford must indemnify plaintiffs for a portion of the *Mabry* settlement.

---

23. Plaintiffs also allude to violations of Illinois common law. If any such claim could be stated (and plaintiffs have offered no support for one), it fails for the same reason as the statutory claim: Hartford has done nothing fraudulent.