**LIBERTY MUTUAL INSURANCE COMPANY**

**v.**

The **CONSOLIDATED MILK PRODUCERS' ASSOCIATION** and David B. **Hatherly, doing business as Hatherly Foods.**

**Civ. A. No. 72–163.**

United States District Court, D. New Hampshire.

Feb. 22, 1973.

Philip G. Peters, Wadleigh, Starr, Peters, Dunn & Kohls, Manchester, N. H., for plaintiff.

Martin L. Gross, Sulloway, Hollis, Godfrey, & Soden, Concord, N. H. for Consolidated Milk Producers' Assn.

Paul A. Rinden, Rinden & Tarrant, Concord, N. H., for David B. Hatherly, doing business as Hatherly Foods.

## OPINION

BOWNES, District Judge.

This is a petition for declaratory judgment pursuant to 28 U.S.C. § 2201. Jurisdiction is based on diversity of citizenship and amount in controversy. 28 U.S.C. § 1332(a)(1).

There are two basic issues:

1. Whether or not the property damage provisions of the insurance policies in effect between Liberty Mutual Insurance Company and the defendant Consolidated Milk Producers' Association cover damages for loss of profits and good will; and

2. Whether or not the policy requirements of written notice "as soon as practicable" were met.

In the case giving rise to this action, Hatherly has sued Consolidated Milk Producers' Association (hereinafter C. M.P.A.) in tort and for breach of express and implied warranty for selling Hatherly defective creamers[1] which he resold to stores, restaurants, hotels, and other food processing and food serving establishments. The damages claimed by Hatherly as stated in his complaint are:

> That, as the result of the wrongs of the defendant as aforesaid, plaintiff has gone to great expense to recover from his customers and replace the product which was sour, spoiled and unpalatable; has lost a number of customers and much business, resulting in a substantial loss of income and profit to your plaintiff; has suffered great damage to his reputation as a reliable businessman dealing in a quality product, and has suffered untold abuse from irate customers; has been put to tremendous expense to rebuild his damaged reputation and regain business and other losses, all to his damage, as he says, in the amount of Sixty-One Thousand Seven Hundred Twenty-One Dollars ($61,720.00) [sic], and interest and costs.

Such damages can be fairly summarized as cost of replacing spoiled product, and loss of profits and goodwill.

■ The issue as to coverage is to be determined by an examination of the policies in the light of Connecticut law. Both parties agree that Connecticut is the State with which they had the most significant relationship and that, therefore, the law of Connecticut applies. Consolidated Mutual Insurance Co. v. Radio Foods Co., 108 N.H. 494, 240 A.2d 47 (1968).

One policy was in effect between 1964 and 1967, and the other from 1967 to 1970. I find no significant differences between them and treat them as one for purposes of this opinion.

The policy is entitled "Special Multi-Peril Policy." Section II of the policy has to do with liability coverage and provides:

I. *Coverage C—Bodily Injury and Property Damage Liability:*

The Company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies, caused by an occurrence and arising out of the ownership, maintenance or use of the insured premises and all operations necessary or incidental to the business of the named insured conducted at or from the insured premises . . .

Property damage is defined in the policy in the following terms: " 'Property damage' means injury to or destruction of tangible property."

Occurrence is defined: " 'Occurrence' means an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured."

■ Connecticut law in regard to the interpretation of insurance policy lan-

---

1. Creamers are small containers of cream ready to be used by a person wishing to add cream to coffee, tea, or any other beverage or food to which cream is usually added.

guage is consistent with the general body of such law elsewhere, including New Hampshire. The terms of a policy are to be accorded their natural and ordinary meaning. Raffel v. Travelers Indemnity Co., 141 Conn. 389, 392, 106 A. 2d 716 (1954). But if the terms are ambiguous and susceptible to more than one interpretation, that which is more favorable to the insured should be adopted. Scranton v. Hartford Fire Insurance Co., 141 Conn. 313, 315, 105 A.2d 780 (1954); Smedley Co. v. Employers Mutual Insurance Co. of Wisconsin, 143 Conn. 510, 123 A.2d 755 (1956).

The natural and ordinary meaning of "property damage" does not include business losses. The defendant takes the position that the policy provides products liability coverage insuring against liability arising from all the consequences due to injurious contact with its product and points to an endorsement in the earlier policy which reads:

> It is agreed that with respect to Products Liability Coverage, this policy provides product coverage only on those products which are processed by, and emanate from the plant facilities at 100 Milk Lane, Newington, Conn.

■ ■ This policy contained the same definition of property damage and the same coverage provision as the policy in effect at the time of the Hatherly claim. For obvious reasons, no law has been cited for the proposition that a limiting endorsement in an insurance policy transforms the whole character of the policy and such transformation continues to a subsequent policy that contains no such endorsement. I reject such proposition out of hand and rule explicitly that these policies are what they state clearly and unambiguously they are—liability insurance policies covering damages because of bodily injury or property damage. The endorsement does not and cannot change the policy to a products liability contract insuring against all consequences arising from injurious contact with the defendant's product.

■ I now address the question of whether the words in the policy, "[t]he Company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages . . . *because of property damage*" encompass loss of profits and goodwill by Hatherly. Hatherly has alleged in his complaint that the creamers purchased from C.M.P.A. were defective because "much of the cream spoiled and became oily, sour and unpalatable." He testified at the hearing that the cream was used mainly in coffee and that patrons of his customers refused to drink the coffee into which the cream was poured. If these allegations are proven, there can be no doubt that the coffee, or whatever product to which the cream was added, was damaged.

The plaintiff has not suggested that the phrase in the coverage provision, "caused by an occurrence," negates coverage. While this was not an occurrence in the usual sense of the word, it falls within the policy definition, since "occurrence means an accident, *including injurious exposure to conditions which result* . . . in property damage neither expected nor intended from the standpoint of the insured." I rule, therefore, that the contact between the spoiled cream and the creamer and the coffee of Hatherly's customers or any other product in which the cream was used was an occurrence within the meaning of the policy.

I have been unable to find a single case standing squarely for the proposition that, under this type of policy, property damage includes loss of profits and goodwill. The defendant has cited a number of cases that might possibly provide a springboard for a long leap to such a conclusion, but the gap between established law and a firm finding is too lengthy and too fraught with imponderables for a trial court to bridge.

The case that comes closest to defendant's position is St. Paul Fire and Ma-

rine Insurance Co. v. Northern Grain Co., 365 F.2d 361 (8th Cir. 1966). In that case, the insured, the operator of a grain elevator, mistakenly sold wheat of the wrong kind to customers. The court held that property damage included the diminution in value of the wheat crop of the insured's customers. The case contains the following language:

We agree that the cases relied upon by appellant predicate recovery upon an "injury to or destruction of property" other than the goods or products of the insured. We do not believe, however, that these cases establish a rule which invariably limits recovery to detectable physical damage which may result to other tangible property from contact with the goods or products of the insured. On the contrary, the cases squarely recognize that consequential damages, including the diminution in value of property, caused by the use or application of a deficient or inferior product, fall within the coverage provisions of an insuring agreement such as that in the case at hand. At page 366.

While the use of the phrase "consequential damages" does lend some support to defendant's position, the key phrase is "including the diminution in value of property." The cases cited by the court and relied on by the defendant all focus on the diminution of value of property. None of them discuss loss of profits and goodwill at all. In Pittsburgh Plate Glass Co. v. Fidelity and Casualty Company of New York, 281 F. 2d 538 (3rd Cir. 1960), the court held that the insurance company had a duty to defend a suit against Pittsburgh for selling defective paint to a jalousie manufacturer who had to remove the jalousies and replace them. Suit was brought by the manufacturer against Pittsburgh to recover the expenses of repairing the jalousies and "other damages." The main case was settled and the insurer was held liable for the amount of the settlement. Nowhere in the case is the phrase "other damages"

defined, nor is there any mention of loss of profits and goodwill.

In Bowman Steel Corp. v. Lumbermens Mutual Casualty Co., 364 F.2d 246 (3rd Cir. 1966), it was held that property damage included damage to buildings in which defective siding had been installed. The court, without expressly so ruling, inferentially held that the expenses of removing and replacing the defective siding for fifty-six customers of Bowman were covered by the policy. Here again, there was no mention of loss of profits or goodwill.

The court in Bowman Steel quoted from Hauenstein v. St. Paul Mercury Indemnity Co., 242 Minn. 354, 65 N.W.2d 122 (1954), which held that the presence of defective plaster on the walls and ceilings of a building reduced the value of the building and the diminution in the market value of the building constituted property damage.

Western Casualty and Surety Co. v. Polar Panel Co., 457 F.2d 957 (8th Cir. 1972), held that where panels installed in a refrigerated building developed blisters, affecting their appearance but not their function, the insurer was liable to the extent of diminution of market value or removing and restoring the panels, whichever was the lesser. There is no reference in the case to profits or goodwill.

While the omission of any reference to loss of profits and goodwill in the cited cases may fairly lead to the conclusion that such damages are not to be included within the meaning of "property damage," a decision based upon an absence of authority does not have a firm precedential footing. There is one case that meets the defendant's contention head on and conclusively rebuts it. In Geddes and Smith, Inc. v. St. Paul Mercury Indemnity Co., 51 Cal.2d 558, 334 P.2d 881 (1959), Chief Justice Traynor, speaking for the court, held:

Plaintiff's judgment against the insured was not limited to such damages [diminution in market value of houses

in which defective doors were installed or cost of removing defective doors plus any loss from deprival of use, whichever is the lesser]. In addition to costs of removal of the doors and loss of use of the houses, it included the other costs of handling the defective doors and their replacements, loss of profits, and loss of goodwill. Plaintiff contends, however, that these additional items of damages constituted damages to its business and goodwill and were therefore damages "because of injury to or destruction of property." We cannot agree with this contention.

When Coverage C is read in the light of the exclusions applicable thereto, it is clear that the word property refers to physical or tangible property. Thus it is such property, not goodwill or a business entity, that is ordinarily thought of as the subject of use, and it is to damage to such property that all of the exclusions are directed. Any breach of contract may harm the business of the injured party, and if sufficiently serious, may affect his goodwill. Such damages, however, are not commonly thought of as injuries to or destruction of property within the meaning of a public liability insurance policy. Defendant did not undertake to insure against all breaches of contract caused by accident. It required an injury to or destruction of property and excluded injury to or destruction of goods or products sold by the insured. The significance of this exclusion would be obvious had the defects appeared before any of the doors had been installed. In such event it could not be seriously contended that an injury to property other than the doors had occurred within the meaning of the policy even though plaintiff's inability to use them seriously interfered with its business and injured its goodwill. Such damages are no less outside the coverage of the policy because there was also damage to the houses.

Chief Justice Traynor's reasoning is, in my opinion, unassailable.

I rule that the property damage coverage of the policy does not include any damages for loss of profits and goodwill.

The only claim of Hatherly that is not included in loss of profits and goodwill is the expense for recovering and replacing soured, spoiled, and unpalatable creamers. Such damage is expressly excluded:

This insurance does not apply

(1) to property damage to the named insured's products arising out of such products or any part of such products.

It seems clear that this exclusionary language applies to the defective creamers produced by the insured, C.M.P.A. Because of the foregoing ruling, it is not necessary to discuss the applicability of exclusions k, m, and n. I will note, however, that if I am wrong in my interpretation of the scope of coverage, then these exclusions offer the plaintiff no grounds for retreat. The plaintiff escapes liability because liability for property damage does not include loss of profits and goodwill, not because of any of the exclusions except as noted above as to (1).

Since the plaintiff is not liable for any of Hatherly's claimed damages, it follows that it has no duty to defend the Hatherly action. Smedley Co. v. Employers Mutual Liability Insurance Co. of Wisconsin, *supra*.

### NOTICE

While the ruling on the issue of coverage effectively disposes of the case, I would be remiss not to make findings and rulings on the issue of notice, since the specter of reversible error always looms in the background for any trial judge. I also would not wish counsel to feel that they had entirely wasted two days on this issue. Notice provisions of the policy provide:

In the event of an occurrence, written notice containing particulars suffi-

cient to identify the insured and also reasonably obtainable information with respect to the time, place and circumstances thereof, and the names and addresses of the injured and of available witnesses, shall be given by or for the insured to the Company or any of its authorized agents as soon as practicable.

The pertinent Connecticut law on notice is best summarized in a Maine case, Security Insurance Group v. Emery, 272 A.2d 736, 739–740 (Me.1971):

> The Justice below properly found the facts on the basis of supportive evidence and rightly concluded that this was a Connecticut contract to be construed in accordance with Connecticut law. What then is the Connecticut law with respect to a policy requirement of notice of an "accident, occurrence or loss" to be given "as soon as practicable"? In effect, the reasonable man test is applied. Would a man of ordinary and reasonable prudence believe that liability because of injury may arise or be claimed? If so, notice must be given as soon as can reasonably be expected under the circumstances. Connecticut recognizes the "trivial accident" theory and delay in notice may be excused if the accident is so trivial that the insured could reasonably believe that no claim would be made. Whether or not the insurer is prejudiced is not material in Connecticut and it has been held flatly that "failure to comply voids coverage even in the absence of prejudice." The Connecticut law is developed and analyzed in the following cases: Silver v. Indem. Ins. Co. of No. Am. (1951) 137 Conn. 525, 79 A.2d 355; Hartford Fed. Sav. & L. Assn. v. Aetna Cas. & Sur. Co. (1964) 25 Conn.Sup. 418, 206 A.2d 650, 655; Preferred Acc. Ins. Co. of N. Y. v. Castellano (1945) 2 Cir., 148 F.2d 761, 762; Employers Liab. Assur. Corp. v. Travelers Ins. Co. (1969) 2 Cir., 411 F.2d 862, 866; Francis v. Maryland Cas. Co. (1967) 2 Cir., 385 F.2d 577, 579; and Curran v. Conn. Indem. Co. of New Haven (1941) 127 Conn. 692, 20 A.2d 87.

## FACTS RELATIVE TO NOTICE

David Hatherly operates a cream business out of New London, New Hampshire. He started purchasing creamers from C.M.P.A. in September of 1966. Hatherly started to have problems with the creamers almost immediately after he started to do business with C.M.P.A. due to feathering and oiling. This meant that there were strings of albumen in the cream, the cream coagulated, and circles of oil formed in the beverages to which the cream was added. Customers complained because the appearance of the cream was disagreeable and, although the taste of neither the cream nor the coffee was affected, it made the coffee look unpalatable. Hatherly continued to do business with C.M.P.A. until May of 1970. He complained regularly about the difficulty he was having with the creamers, but it was not until July of 1970, at a meeting with Brown and Burkhardt of C.M.P.A. that he suggested that he might bring a claim against it for business losses, including loss of profits and damage to his goodwill. Hatherly carried a continuous overdue account with C.M.P.A. and, after he stopped doing business with it in May of 1970, Brown and Burkhardt had come to see him in an attempt to settle his past due bill. In late December of 1970, there was another meeting between Hatherly and representatives of C.M.P.A. and, at this time, C.M.P.A. made an attempt to settle the entire claim for $11,000, which included loss of profits. This offer was turned down by Hatherly and no settlement was arrived at. At this time, they both agreed that a law suit was probably in the offing.

In October of 1970, James Wilson, Administrative Executive for C.M.P.A., Mr. Burkhardt, and another representa-

tive of C.M.P.A. met with representatives of the Liberty Mutual Insurance Company. The purpose of the meeting was to try to determine the coverage that C.M.P.A. had under its Liberty Mutual Insurance Company policy. Mr. Wilson testified that "the object was to determine the discrepancy between the coverage alleged by the sales people and the coverage actually given by the claims people of Liberty." At this meeting, the Hatherly problem and putative claim was discussed and Liberty was told that Hatherly owed C.M.P.A. money on past due accounts and that he might make a claim for loss of business. The representatives of Liberty Mutual did not at that time either disclaim coverage or indicate that there was coverage. They dodged the issue. There was another meeting between C.M.P.A. and Liberty Mutual on March 20, 1971. At that time, the Hatherly situation was again discussed and the Liberty Mutual representatives informed C.M.P.A. that the question of coverage was a gray area and it would probably take a law suit to settle the question. Liberty Mutual made no commitment relative to the Hatherly claim and indicated they wanted to wait and see if there was going to be a law suit before making a decision as to coverage.

Suit was instituted by Hatherly against C.M.P.A. in the Federal District Court for the District of New Hampshire on January 27, 1972. Notice of this suit was given to Liberty Mutual on February 3, 1972, by a letter from the attorney for C.M.P.A. which contained a copy of the complaint. (Ex. F).

## SPECIFIC FINDINGS

The first time that C.M.P.A., as a reasonable prudent person, knew or should have known that Hatherly was probably going to make a claim against it for business losses, including loss of profits and goodwill, was in December of 1970.

Liberty Mutual had been advised orally of a possible claim for loss of profits and goodwill by Hatherly in October of 1970, but dodged the question of coverage. In March of 1971, Liberty indicated to C.M.P.A. that the question of coverage for loss of profits and goodwill could probably only be settled by a law suit.

C.M.P.A. never definitely knew that there was going to be a law suit by Hatherly until the complaint was served on it. In this connection, it is important to note that C.M.P.A. had brought a suit in the State Court in New Hampshire on March 4, 1971, against Hatherly for the balance due it.

## RULINGS

■ Under these facts, I rule that C.M.P.A. gave written notice to Liberty Mutual as soon as practicable and reasonable, applying the standard of a reasonable prudent man under these circumstances. This is not the situation of one definite event that happened solely within the knowledge of the insured which the insured failed to report to the company. The insured here had been advised by the company that there might not be coverage for this type of claim and it never knew positively that a claim would be made until the complaint was actually served upon it. Notice was promptly given after Hatherly's suit was instituted.

■ I further rule, based on the conversations between Liberty representatives and C.M.P.A. representatives in October of 1970 and March of 1971, that Liberty is now estopped from claiming failure to give notice.

Judgment for the plaintiff.

So ordered.