GIBRALTAR CASUALTY COMPANY, Plaintiff-Appellant and Cross-Appel-
lee, v. SARGENT AND LUNDY, Defendant-Appellee and Cross-Appellant
(Wabash Valley Power Association, Defendant).

First District (3rd Division)   No. 1—89—1277

Opinion filed August 1, 1990.—Rehearing denied June 19, 1991.—
Modified opinion filed June 26, 1991.

Peterson, Ross, Schloerb & Seidel, of Chicago, for appellant.

McDermott, Will & Emery, of Chicago, for appellee.

PRESIDING JUSTICE CERDA delivered the opinion of the court:

Plaintiff, Gibraltar Casualty Company, appeals from the entry of summary judgment in favor of defendant, Sargent & Lundy Engineers (S&L), in plaintiff's declaratory judgment action which sought a declaration that plaintiff did not have the duty to defend or indemnify S&L, its insured, which had been sued in Federal court. Plaintiff argues that: (1) the trial court erred in finding that damages and an occurrence as defined in the insurance policy had been alleged in the Federal complaint against S&L; (2) the granting of summary judgment was error because material issues of fact existed as to whether

S&L gave the required notice to plaintiff and cooperated with plaintiff; (3) it should not be required to defend S&L because of conflicts in interest; and (4) coverage was excluded under several policy provisions. S&L cross-appeals from the denial of its motion for sanctions against plaintiff, and S&L requests sanctions on appeal.

S&L was one of the defendants in a Federal lawsuit brought by Wabash Valley Power Association, Inc. (Wabash). Wabash's third amended complaint alleged defendants' securities laws violations, Racketeer Influenced and Corrupt Organizations Act (RICO) violations, common law fraud, constructive fraud, deceit, and negligent misrepresentation and S&L's breach of contract and negligence.

The Federal complaint alleged the following factual background. Wabash was an Indiana electric energy generation and transmission cooperative which served as a wholesale power supplier of its members by purchasing electric power and energy. Defendant Public Service Company of Indiana (PSI) was an Indiana public utility. Defendant S&L was an Illinois engineering firm. Several individuals and other companies were also named as defendants. In 1975, Wabash agreed to invest in the Marble Hill project to construct two nuclear-powered generating units in Indiana based upon representations about the beginning of commercial operations and the estimated total construction cost. Agreements were entered into between PSI and Wabash, and PSI was given the sole responsibility for the design and engineering of the project. Wabash only had an investment interest in the project whereas PSI was to construct and operate Marble Hill. Wabash owned 17% of Marble Hill, and PSI owned 53%. Wabash obtained a loan for its investment based upon PSI's estimate of the total project cost. Wabash made an initial payment and was billed monthly by PSI for 17% of costs.

In 1979, the Nuclear Regulatory Commission stopped certain construction work at Marble Hill primarily because of faulty concrete placements. For about 30 months, "nuclear-related" construction was stopped or slowed. In 1980, PSI informed Wabash that the commercial operation dates had been delayed and that the cost estimate had increased. As a result, Wabash's cost for its investment increased. PSI did not disclose to Wabash that it knew the cost would increase even more and that there was doubt about its ability to finance the increased cost. Wabash applied to borrow additional funds to continue its 17% investment.

Projected cost increases and additional delays were again announced in 1981 and 1982. PSI failed to disclose to Wabash that it did not have the financial ability to complete Marble Hill or that the cost

estimates did not take into account problems known to PSI and the other defendants. Periodic reports from PSI failed to disclose and/or misrepresented material facts regarding the status of the project. The other defendants engaged in, knew of, aided and abetted, permitted, acquiesced in, or recklessly ignored PSI's failures to disclose or misrepresentations of these facts. Defendants failed to disclose the true magnitude of construction problems, misstated the necessary corrective measures, and misrepresented the impact on cost and schedule objectives.

In 1983, PSI again increased the cost estimate but represented that the commercial operations dates were still achievable. Later in that year, PSI announced a two-year delay and again increased the cost estimate. PSI failed to disclose its knowledge prior to this time that construction and regulatory problems would increase the cost and delay construction. Later, PSI misrepresented the substantial likelihood that it would cancel Marble Hill. Wabash made payment to PSI after PSI had already decided to abandon the project which was not disclosed to Wabash.

Count I alleged violations of section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. §78j(b) (1982)), Rule 10b—5 (17 C.F.R. §240.10b—5 (1989)), and section 17(a) of the Securities Act of 1933 (15 U.S.C. §77q(a) (1982)). Since at least the date of Wabash's initial investment, defendants engaged in a continuing course of conduct, including the making of false and misleading statements and the concealment of material facts necessary to make such statements not misleading, which had the purpose and effect of fraudulently inducing and maintaining Wabash's investment. S&L along with other defendants had knowledge of, aided, permitted, acquiesced in, or recklessly ignored misrepresentations and failures to disclose to Wabash material facts regarding Marble Hill's and PSI's financial conditions. As a result, Wabash lost an investment of over $466 million, it was liable for the interest due on repayment of its loan, and it was denied the income which it anticipated earning from the investment.

Count II alleged violations of RICO based upon the conduct alleged in count I. It was alleged that defendants conspired to, conducted, and participated in the conduct of the affairs of the enterprise with which they were associated through a pattern of racketeering activity. Defendants devised a scheme to defraud Wabash which included: purposeful concealment; failing to disclose, concealing, and misrepresenting to Wabash material facts; and making false statements. Wabash had been injured because it made business, investment and operational decisions based upon defendants' conduct and because

it paid substantially more for its investment than it otherwise would have paid.

Count III alleged defendants' common law fraud based upon the conduct alleged in count I. It was also alleged that S&L defrauded Wabash, entered into a conspiracy with PSI and the other defendants to defraud, and aided and abetted the fraud by failing to make disclosures, concealing, agreeing to conceal and making misrepresentations. As a result of defendants' misrepresentations, Wabash invested and paid substantially more than it otherwise would have paid.

Count IV alleged constructive fraud and deceit based upon conduct alleged in count I. Pursuant to the ownership agreement, PSI had sole responsibility to contract with third parties on behalf of Wabash, and PSI entered into a contract with S&L on behalf of itself and Wabash. S&L was a professional with ethical and professional duties to its clients to disclose material facts regarding its professional work and to exercise reasonable care to disclose facts basic to the transaction. S&L failed to disclose facts essential to Wabash's investment which it knew might reasonably induce Wabash to refrain from making payments although S&L had knowledge of the facts and was under a duty to exercise reasonable care to disclose such facts. S&L committed deceit against Wabash by failing to disclose certain facts. As a result of defendants' deceit, Wabash invested in Marble Hill and paid substantially more for its investment than it otherwise would have paid.

Count V alleged negligent misrepresentation against PSI.

Count VI alleged breach of contract against S&L. PSI retained S&L pursuant to an agreement which gave PSI the sole responsibility for the construction of Marble Hill and the authority to employ an engineering firm and execute contracts for the design and engineering. The agreement provided that contracts entered into by PSI after execution of this agreement would inure to the benefit of both parties. S&L was to provide the engineering and design work required for the procurement of plant equipment and construction of Marble Hill. PSI and S&L entered into an amended agreement for engineering services which provided that S&L was to design Marble Hill as a replicate of the Byron nuclear generating station. PSI executed the engineering services agreement with S&L as Wabash's agent. It was alleged that Wabash had standing to sue for S&L's breaches of contract either as a party to the agreement or, alternatively, as a third-party beneficiary.

It was alleged that S&L breached the contract by: failing to accurately, timely and adequately review the Byron structural design before inclusion in the Marble Hill structural design; failing to correctly

and timely investigate, analyze and identify the loads to be carried by the structural steel; providing a design for the structural steel beams and connections that was deficient and contrary to accepted standards of practice and regulatory requirements which resulted in the fabrication and installation of structural steel of insufficient load-carrying capacity; permitting construction to continue when it knew or should have known that the structural steel fabricated and installed according to its structural design criteria was inadequate to support the loads; and by committing certain acts of misrepresentation alleged in prior counts.

Wabash alleged that as a result of S&L's breach, PSI was required to reinforce or replace structural beams and connections which resulted in additional costs and delays and ultimately in the abandonment of Marble Hill and in the loss of Wabash's entire investment. S&L also allegedly willfully and wantonly concealed the nature of the design deficiencies and thereby prevented repairs from being made when they could have been done with less expense and delay. As a result, Wabash lost its investment.

Count VII alleged S&L's negligence in breaching its duty of care, in performing its engineering and design work, and in failing to exercise the care and skill usually exercised by professional engineers by: providing a structural design which was inadequately tested, technically unsound, unsafe, and unreliable; failing to review accurately and adequately the Byron structural design before inclusion in the Marble Hill structural design; failing to correctly investigate, analyze and identify the loads to be carried by the structural steel; permitting construction to continue when it knew or should have known that the structural beams and connections installed according to its design criteria were inadequate; and committing certain acts of misrepresentations alleged in prior counts.

Wabash further alleged that S&L willfully, wantonly, recklessly and maliciously committed the breaches of contract and negligent acts. S&L also allegedly willfully and wantonly concealed the nature of the design deficiencies and thereby prevented the making of repairs when possible with less expense and delay. As a result, Wabash lost its investment.

Plaintiff prayed for damages including punitive damages and the return of its investments and of PSI's payments made on Wabash's behalf to S&L and two other defendants.

Plaintiff filed an amended complaint for declaratory judgment against S&L and Wabash alleging that plaintiff issued a policy to S&L under which S&L was to pay $500,000 of the cost of its defense. S&L

had demanded that plaintiff pay for its defense by the law firm of McDermott, Will & Emery for any judgment within the policy limits entered against it.

Count I of the amended complaint for declaratory judgment alleged that S&L violated the conditions of the policy by: not giving notice of the claim immediately but intentionally concealing the claim and otherwise failing and refusing to cooperate; by not promptly taking all reasonable steps to prevent other damage but intentionally concealing the damage, thereby causing and/or allowing further damage; and by otherwise failing and refusing to cooperate. Plaintiff alleged that because of this breach it had no obligation to defend or pay any judgment.

Count II alleged that no occurrence as defined in the policy was alleged in the Federal complaint.

Count III alleged that the Federal complaint sought no covered relief because the claim for punitive damages based on S&L's malicious, oppressive, wanton and willful misconduct sought relief for a loss arising from S&L's intentionally committed wrongful acts. Such a claim was excluded from coverage by policy exclusion IV and by the public policy prohibiting insurance against liability for punitive damages. The relief sought was also not covered because the claims for rescission and restitution did not seek damages but sought equitable relief and because relief was not sought for property damage but for intangible damages for lost investment and lost profits.

Counts IV through VIII alleged that coverage exclusions applied to the Federal complaint.

Plaintiff's amended complaint sought a declaration that: the complaint alleged facts which, if true, would be violations by S&L of the conditions clause of the policy and that plaintiff therefore owed no duty to S&L either to defend it or to pay any judgment entered against it; the Federal complaint did not allege an occurrence and that plaintiff therefore owed no duty to S&L either to defend it or to pay any judgment entered against it; the complaint set forth no claim for relief covered by the policy because punitive damages arising from willful wrongdoing were excluded from coverage; rescission and restitution constituted equitable relief and not damages, and lost investment and lost profits constituted intangible damage and not property damage; exclusions IX, V, VI, and VII applied to the Federal complaint so that plaintiff owed no duty to S&L to defend or to indemnify it; and the deductible provision of the policy providing that the cost of redesign, changes, additions or remedies necessitated by a claim was

not recoverable under the policy applied to counts VI and VII so that plaintiff had no duty to defend or indemnify S&L as to those counts.

Plaintiff's amended complaint for declaratory judgment was substantially similar to the original complaint except that, contrary to S&L's argument on appeal, it specifically responded to counts VI and VII, which were added by the third amended Federal complaint (see count IV, paragraphs 45 and 46 through 48; count V, paragraphs 60 through 63; and count VIII, paragraphs 69 and 72).

The professional liability coverage section of S&L's policy provided in part:

"A. Obligation to pay

The Company, subject to all the provisions of the policy will pay on behalf of the *Insured* all sums in excess of the deductible which the *Insured* shall become legally obligated to pay as *damages* arising out of an *occurrence* to which this policy applies. The Company may investigate and, with the written consent of the *Insured*, settle any *claim* as it deems expedient.

B. Obligation to Defend

The Company, subject to the provisions of I.A. above, shall have the right and duty to defend any *claim* against the *Insured* arising out of such *occurrence* whether actual or alleged, even if the allegations of the *claim* are groundless or false." (Emphasis in original.)

Paragraph B of section V captioned "Deductible" stated:

"Any professional service rendered or expense incurred by the *Insured* for redesign, changes, additions or remedies necessitated by a *claim* [as defined in A., B. and C. of the definitions of the word claim], and any return, withdrawl [*sic*] or reduction of fees shall not be recoverable under this policy nor chargeable against the deductible." (Emphasis in original.)

"Claim" was defined as:

"A. a demand or request received by the *Insured*, whether written or oral, for *damages*, money or services arising out of an *occurrence* or an alleged *occurrence*;

B. the service of a summons on a suit or a demand for arbitration proceedings against the *Insured* arising out of an *occurrence* or an alleged *occurrence*;

C. an *occurrence* or alleged *occurrence* of which an *Insured* has knowledge which has resulted in *damages*;

D. an *occurrence* or alleged *occurrence* of which an *Insured* has knowledge which may result in *damages*." (Emphasis in original.)

"Damages" was defined as:

"compensation for loss or injury to person or property, including compensation for *bodily injury, personal injury* or *property damage*, but does not include fines, penalties or the return, withdrawal or reduction of professional fees." (Emphasis in original.)

"Occurrence" was defined as "a professional act, error or omission of the *Insured* arising out of the performance of their professional services." (Emphasis in original.)

"Property damage" was defined as:

"A. physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom;

B. loss of use of tangible property which has not been physically injured or destroyed, provided such loss of use is caused by an *occurrence* during the policy period." (Emphasis in original.)

Two of the conditions were:

"A. Notice to the Company:

1. In the event of a *claim*, the *Insured* immediately shall give written notice to the Company, but in any event within 60 days after cancellation or non renewal of the policy, whichever occurs first. * * *

2. Such notice shall contain all details of the *claim* including * * * information with respect to the date, location and circumstances thereof, the names of all parties who claim or may claim damage or injury and a description of the nature and scope of such alleged damage or injury.

B. Cooperation of the *Insured*:

1. The *Insured* shall cooperate with the Company. Upon the Company's request, the *Insured* shall provide all information, records and documents required by the Company * * * for the investigation and defense of *claims*, shall attend hearings, depositions and trails [*sic*] and shall assist in effecting settlemeant, [*sic*] securing and giving evidence, obtaining the attendance of witnesses in the conduct of suits, as well as in the Company's representatives. [*sic*] * * *

2. In the event of a *claim* of which an *Insured* has knowledge, the *Insured* shall take promptly at their own expense

all reasonable steps to prevent other damage or injury arising out of the same *claim*." (Emphasis in original.)

S&L filed a motion for summary judgment in which it also sought reasonable attorney fees and costs incurred in responding to plaintiff's amended complaint pursuant to section 2—611 of the Illinois Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 2—611) and section 155 of the Illinois Insurance Code (Ill. Rev. Stat. 1987, ch. 73, par. 767). S&L argued that the insurance policy explicitly covered the professional malpractice claims alleged in the Federal complaint and because at least some of the claims in the complaint fell within the coverage of the policy, plaintiff had a duty to defend. S&L also argued that plaintiff's request for a declaration that it had no duty to indemnify S&L was premature because the duty was not to be determined until after resolution of the underlying lawsuit. S&L argued for the award of attorney fees on the bases that plaintiff's amended complaint ignored the factual allegations of professional malpractice and that plaintiff's refusal to acknowledge that its policy covered the allegations was vexatious, unreasonable and not warranted by existing law.

Attached as an exhibit to S&L's motion for summary judgment was the affidavit of attorney Frank M. Covey, Jr., who swore that on February 15, 1984, he notified the authorized claims handling facility that Wabash had filed suit against PSI. Plaintiff was later notified when a subpoena was served upon S&L by Wabash.

S&L's motion to compel plaintiff to pay its defense costs pending the resolution of the lawsuit was denied.

The trial court granted the motion for summary judgment on the bases that plaintiff had a duty to defend S&L, the professional liability insurance coverage was broad, and the allegations arose out of S&L's professional work so that the exclusions that plaintiff raised were unavailing. The trial court denied plaintiff's "request for a declaratory judgment as to the duty to indemnify" S&L. In addition, S&L's motion for attorney fees was denied.

Plaintiff first argues that the trial court erred in finding that covered damages were alleged in the complaint because it claimed economic loss such as lost investment and profits and not loss to tangible property. S&L first responds that plaintiff had the duty to defend S&L against any claim arising out of an occurrence so that an allegation of damages was not necessary to trigger the duty to defend. Plaintiff replies that because it had, "subject to the provision of" the section on the obligation to pay, the duty to defend any claim arising out of an occurrence and because the section on the obligation to pay

stated that plaintiff was liable for the amount of damages in excess of the deductible, a complaint must allege damages to trigger the duty to defend.

■■ The provision of the duty to defend does not on its face require damages to be alleged before the duty is triggered. But, without determining whether plaintiff would have to defend S&L in a suit that did not seek damages, we hold that if damages are sought against the insured, they must be within the potential coverage of the policy to trigger the duty to defend.

S&L also argued that even if an allegation of damages was required to trigger the duty to defend, the definition of damages covered all loss or injury because the definition of damages listed property damage as only an example of damages. The definition gives property damage as an example of the covered damages, but damages are limited to compensation for either loss or injury to person or loss or injury to property. In addition, the existence of a definition of damages belies the argument that any loss is covered.

The next issue is whether the lawsuit alleged property damage as defined by the insurance policy. Plaintiff argues that each count alleged that the damages arose from lost investment, profits and interest paid to finance the investment so that only noncovered economic losses had been alleged. S&L argues that even if the policy only covered property damage, plaintiff had the duty to defend because the definition of property damage included both loss of use of tangible property which has been physically injured or destroyed and loss of use of tangible property which has not been physically injured or destroyed.

■■ Loss of use as distinguished from loss of profits is the loss of the right to use property which is an incident of ownership. (*American Telephone & Telegraph Co. v. Connecticut Light & Power Co.* (D. Conn. 1979), 470 F. Supp. 105, 108.) Loss of use claims are not the same as claims for anticipated profits or loss of investment, and a party's description of loss of use damages as merely economic does not take them outside the coverage of an insurance policy that defines property damage as including loss of use. *W.E. O'Neil Construction Co. v. National Union Fire Insurance Co.* (N.D. Ill. 1989), 721 F. Supp. 984, 994.

Most of the cases cited by plaintiff either did not involve a definition of property that included a loss of use or are otherwise distinguishable. *Hamilton Die Cast, Inc. v. United States Fidelity & Guaranty Co.* (7th Cir. 1975), 508 F.2d 417 (damaged business reputation and customer refunds not covered under definition of property dam-

age that did not include loss of use); *CMO Graphics, Inc. v. CNA Insurance* (1983), 115 Ill. App. 3d 491, 450 N.E.2d 860 (insured did not argue that complaint sought damages for loss of use); *Sentry Insurance Co. v. S & L Home Heating Co.* (1980), 91 Ill. App. 3d 687, 414 N.E.2d 1218 (loss of productivity not covered under definition of property damage that did not include loss of use); *Ludwig Candy Co. v. Iowa National Mutual Insurance Co.* (1979), 78 Ill. App. 3d 306, 396 N.E.2d 1329 (lost profits and good will and damage to business reputation not covered under definition of property damage that did not include loss of use); *Hartford Accident & Indemnity Co. v. Case Foundation Co.* (1973), 10 Ill. App. 3d 115, 294 N.E.2d 7 (property damage did not include loss of financing commitments for building construction, anticipated profits and financial interest in business ventures incurred as a result of breaches of contract and negligent construction of building because the policy only covered damages that resulted from injury or destruction of property); *General Insurance Co. of America v. Western American Development Co.* (1979), 43 Or. App. 671, 603 P.2d 1245 (no loss of use where property was worth less than represented); *Liberty Mutual Insurance Co. v. Consolidated Milk Producers' Association* (D. N.H. 1973), 354 F. Supp. 879 (business losses not covered where definition of property damage did not include loss of use); *Kartridg Pak Co. v. Travelers Indemnity Co.* (Iowa App. 1988), 425 N.W.2d 687 (diminution in value of product which was used in leased machine which did not perform as promised was not property damage under definition that did not include loss of use).

■■ There is loss of use of a new or existing building or other structure where faulty construction causes construction delay and the temporary inability to use the property, and loss of use damages include the cost of correcting the defect. See *United States Fidelity & Guaranty Co. v. Wilkin Insulation Co.* (1989), 193 Ill. App. 3d 1087, 1097 (loss of use of public buildings alleged where incorporation of asbestos made buildings unsafe for use until asbestos-containing materials were replaced); *Ohio Casualty Insurance Co. v. Bazzi Construction Co.* (7th Cir. 1987), 815 F.2d 1146, 1148 (loss of use of building being remodeled alleged where its structural integrity was compromised because of defective steel so that building was unsafe and unusable, time was lost in operating the business, and portions had to be rebuilt or reinforced); *American Motorists Insurance Co. v. Trane Co.* (7th Cir. 1983), 718 F.2d 842, adopting opinion of *American Motorists Insurance Co. v. Trane Co.* (W.D. Wis. 1982), 544 F. Supp. 669, 687 (loss of use of liquid natural gas plants alleged where plants were unable to operate at full capacity due to faulty component parts sup-

plied by insured); *Western World Insurance Co. v. H.D. Engineering Design & Erection Co.* (Minn. App. 1988), 419 N.W.2d 630, 635-36 (loss of use damages included contractor's additional costs to reerect building which collapsed after subcontractor negligently placed materials on roof because contractor lost use of steel and other property damaged in the accident); *Federated Mutual Insurance Co. v. Concrete Units, Inc.* (Minn. 1985), 363 N.W.2d 751, 756-57 (loss of use of grain elevator under construction was alleged where construction delays were caused as a result of the use of defective concrete supplied by insured, and the loss of use damages included the cost of piling bushels of corn, the loss of the use of storage space, and the inability to dry bushels of corn). See also *W.E. O'Neil Construction Co. v. National Union Fire Insurance Co.* (N.D. Ill. 1989), 721 F. Supp. 984, 992-94 (loss of use alleged where portion of garage that the owner intended to rent to others was unusable after construction because of improper placement of steel, and loss of use damages were the diminution in market value of garage spaces).

The Federal complaint alleged that Marble Hill was never completed and that because of the repairs necessitated by the defective structural steel there were construction delays and there were increased costs of which a portion was paid by Wabash as one of the owners. Wabash also allegedly lost anticipated profits, which might not constitute loss of use damages (see *McCollum v. Insurance Co. of North America* (1982), 132 Ariz. 129, 644 P.2d 283 (loss of anticipated profits on purchase of land was not loss of use of property); *L. Ray Packing Co. v. Commercial Union Insurance Co.* (Me. 1983), 469 A.2d 832 (no loss of use where profits lost because of inability to sell product in free market due to antitrust violations)), but we do not decide the profits issue.

■ We hold that the allegations of an increase in the cost of Wabash's investment and construction delays were sufficient to allege a loss of use of Marble Hill within the definition of property damage as a loss of use of tangible property which had not been physically injured or destroyed. The necessity of making repairs resulted in the delaying of the anticipated completion date. As part owner, Wabash would have had an ownership interest in the completed facility. Wabash was an investor which sought to make profits, but it also was an owner, and as a result of its status as an owner, it allegedly bore part of the cost to make the repairs. Loss of use damages were sought and therefore plaintiff had the duty to defend S&L.

Plaintiff next argues that the trial court erred in finding that a covered occurrence was alleged. "Occurrence" is defined as "a profes-

sional act, error or omission of the *Insured* arising out of the performance of their professional services" (emphasis in original). Plaintiff argues that S&L was charged in each count with criminal conduct, fraud or willful and wanton conduct, all of which are not professional services inherent in the practice of the engineering profession, and that although design problems were alleged, it was rather the wrongful concealment of those problems that was the basis for the claims. S&L responds that the complaint alleged its professional malpractice and that this was an occurrence. Plaintiff also argues that S&L could not be sued for breach of contract because the complaint alleged that PSI rather than Wabash contracted with S&L for engineering work and that a valid breach of contract count would not be covered because a professional liability insurance policy is not a performance bond.

■ An insurer has the duty to defend if any allegation indicates potential coverage. (*Maryland Casualty Co. v. Peppers* (1976), 64 Ill. 2d 187, 193, 355 N.E.2d 24.) Doubts as to coverage are resolved in favor of the insured. (*Management Support Associates v. Union Indemnity Insurance Co.* (1984), 129 Ill. App. 3d 1089, 1096, 473 N.E.2d 405.) The threshold that the complaint must satisfy to present a claim of potential coverage is low. (*Management,* 129 Ill. App. 3d at 1096.) An insurer can justifiably refuse to defend only when the allegations clearly show on their face that the claim is beyond coverage because the duty to defend is broader than the duty to pay. *Management,* 129 Ill. App. 3d at 1096.

■ Count VII alleged an occurrence: S&L's negligence in breaching its duty of care, in performing its engineering and design work, and in failing to exercise the care and skill usually exercised by professional engineers by, among other things, providing an unsound design. Even if count VII was the only count that alleged an occurrence and other causes of action or theories of recovery existed against the insured, plaintiff would have the duty to defend. *Maryland,* 64 Ill. 2d at 194.

■ Plaintiff next argues that the trial court erred in granting S&L's motion for summary judgment because there were genuine issues of material fact as to whether S&L breached the insurance policy by failing to give notice and by failing to cooperate. Plaintiff contends that the basis for each count against S&L was concealment so that factual issues existed about whether S&L gave immediate notice of the claim and took the necessary steps to prevent additional damages.

In support of its motion for summary judgment, S&L offered an affidavit that stated that notice of the Federal lawsuit had been given

to plaintiff. Plaintiff did not file counteraffidavits or offer any evidence creating a genuine issue of material fact as to S&L's failure to give notice and to cooperate. When the movant supplies facts which, if not contradicted, would entitle it to judgment as a matter of law, the party opposing summary judgment cannot rely alone on the complaint to raise genuine issues of material fact. (*Carruthers v. B.C. Christopher & Co.* (1974), 57 Ill. 2d 376, 380, 315 N.E.2d 457.) The trial court therefore did not err in granting S&L's motion for summary judgment on this basis.

Plaintiff next argues that it would have a conflict of interest if it defended S&L, because a finding that S&L did not give notice of a claim would be in plaintiff's interest, so that it should not be required to defend S&L and should reimburse S&L for defense costs later. Relying upon *Burd v. Susset Mutual Insurance Co.* (1970), 56 N.J. 383, 267 A.2d 7, plaintiff also argues that the facts concerning notice and cooperation cannot be adjudicated in the declaratory judgment action because of possible prejudice to S&L or Wabash and that these facts will not be resolved in the Federal complaint. Plaintiff argues that, therefore, summary judgment should be vacated and the declaratory judgment action should be stayed until after the Federal suit is tried. Plaintiff did not raise these issues either in its complaint for declaratory judgment or in its response to S&L's motion for summary judgment. Even if these arguments were not thereby waived, the conflict of interest and possible prejudice problems are avoided because under *Maryland Casualty Co. v. Peppers* (1976), 64 Ill. 2d 187, 198-99, 355 N.E.2d 24, S&L would be represented by its own attorney and because plaintiff could raise noncoverage in a subsequent suit on the policy.

*Maryland* held that absent the acceptance of the defense by the insured after full disclosure by the attorney of the conflicting interests arising because of the insurer's interest in a finding that the insured intentionally injured plaintiff, which was one of the ultimate facts upon which recovery was predicated, and absent the insurer's waiver of the defense of noncoverage, the insured has the right to be defended by an attorney of his own choice who will have the right to control the conduct of the case. (*Maryland*, 64 Ill. 2d at 198-99.) The court also held that the insurer had to reimburse the insured for the reasonable cost of defense and that the insurer was not barred from subsequently raising the defense of noncoverage in a suit on the policy because the issue of coverage could not have been determined in the declaratory judgment action prior to the resolution of the third party's suit against the insured. (*Maryland*, 64 Ill. 2d at 199.)

*Thornton v. Paul* (1978), 74 Ill. 2d 132, 155, 159, 384 N.E.2d 335, also held that in the case of the insurer's conflict of interest, the insurer's obligation to provide a defense should be satisfied by reimbursing the insured for the defense costs.

Neither *Maryland* nor *Thornton* adopted the holding of *Burd v. Sussex Mutual Insurance Co.* (1970), 56 N.J. 383, 267 A.2d 7, that the insurer could reimburse the insured for costs of defense *later*, after an adjudication that the claim was one within the covenant to pay. But neither of these cases nor the cases cited by S&L in response (*Pepper Construction Co. v. Casualty Insurance Co.* (1986), 145 Ill. App. 3d 516, 495 N.E.2d 1183; *Illinois Masonic Medical Center v. Turegum Insurance Co.* (1988), 168 Ill. App. 3d 158, 522 N.E.2d 611) clearly state that reimbursement is to occur before the resolution of the third party's suit against the insured.

We find persuasive the reasoning of *Village Management, Inc. v. Hartford Accident & Indemnity Co.* (N.D. Ill. 1987), 662 F. Supp. 1366, 1374, which held that when the insured has to hire its own counsel because of the insurer's conflict of interest, the insurer has the duty to reimburse the defense costs as they are incurred. *Village* reasons that the insured could not be provided an effective defense it if was reimbursed only at the end of the case. (662 F. Supp. at 1374.) *Village* found that the suggestion in *Burd* that the insurer could reimburse the insured after policy defenses were resolved was hard to reconcile with the concept that the duty to defend was not coextensive with policy coverage. 662 F. Supp. at 1374 n.13.

Plaintiff next argues that the trial court erred in granting summary judgment in favor of S&L because plaintiff would have a conflict of interest if it defended S&L because, in light of exclusion IX for intentional wrongful acts, a finding of S&L's willful misconduct would be in plaintiff's interest. For the same reasons stated above, this argument is rejected.

Plaintiff next argues that the trial court erred in entering summary judgment in favor of S&L because the complaint alleged claims that fell within exclusion V:

> "[A]ny act, error or omission of the *Insured* which is not in connection with the customary or usual performance of professional services by the *Insured*." (Emphasis in original.)

Plaintiff argues that the allegations of securities fraud (count I), RICO violations (count II), common law fraud (count III), fraud and deceit (count IV), willful and wanton misconduct (count VI), and willful, wanton, reckless and malicious conduct (count VII) are not claims relating

to the customary or usual professional services of an engineering firm.

S&L first responds that plaintiff was estopped from raising any policy exclusions because of its failure to defend. It argues that in order to claim the application of policy exclusions, the insurer must either *secure* a declaratory judgment while defending under a reservation of rights or defend but adjudicate its coverage in a supplemental suit. (*Country Mutual Insurance Co. v. Murray* (1968), 97 Ill. App. 2d 61, 73, 239 N.E.2d 498.) The first district recently held to the contrary that an insurer who did not defend the underlying action was not estopped from raising policy exclusions because it had *filed* a declaratory judgment action; rejected was the argument that the insurer breached its contractual duty to defend by not securing a declaratory judgment. *Insurance Co. v. Markogiannakis* (1989), 188 Ill. App. 3d 643, 651, 544 N.E.2d 1082.

Counts VI and VII allege that S&L breached its contract to provide engineering and design work and was negligent in performing engineering and design tasks. Exclusion V does not apply because the allegations of negligence are in connection with S&L's performance of professional services.

Plaintiff next argues that the trial court erred in entering summary judgment in favor of S&L because exclusion VI provided for

"liability arising out of cost or quantity estimates on design work which has been performed by others."

This exclusion is inapplicable because the complaint neither alleged that the cost and schedule were based only on design work performed solely by parties other than S&L nor alleged that S&L was liable because of these estimates done by another.

Plaintiff finally relies upon exclusion VII:

"*property damage* to

A. property owned, occupied or used by or rented or leased to the *Insured*;

B. property in the care, custody or control of the *Insured* or as to which the *Insured* is for any purpose exercising physical control." (Emphasis in original.)

Plaintiff argues that there was an issue of fact as to whether S&L as engineer exercised the requisite degree of care, custody or control of the property to invoke this exclusion. S&L responds that it was not the owner of the plant and that there was no allegation in the complaint to support plaintiff's assertion that S&L as engineer exercised some degree of control. S&L also responds that under plaintiff's interpretation that an engineer who exercised some degree of control

over the work site would not be covered, an engineer could never require its insurer to defend it in any action.

Plaintiff cites *Estrin Construction Co. v. Aetna Casualty & Surety Co.* (Mo. App. 1981), 612 S.W.2d 413, in which it was held that there was substantial evidence to find that a control exclusion was applicable to a general contractor who was contractually obligated to supervise the construction job and to protect the property during construction. (*Estrin*, 612 S.W.2d at 428.) The general contractor brought an action against its insurer for its costs incurred due to the insurer's refusal to defend. Plaintiff also cites *L.L. Jarrell Construction Co. v. Columbia Casualty Co.* (S.D. Ala. 1955), 130 F. Supp. 436, in which a construction company sued its insurer for damages resulting from an accident on a construction project and in which it was held that a damaged wall was in the care, custody, or control of the insured.

*Estrin* and *L.L. Jarrell* involved different procedural postures than the instant case. The issue of the control exclusion's applicability is raised here in the context of a declaratory judgment action that sought a determination that plaintiff did not have to defend S&L. The test is whether, if the complaint's allegations were true, they would exclude coverage so that the insurer has no duty to defend. (*Insurance Co. v. Markogiannakis* (1989), 188 Ill. App. 3d 643, 661, 544 N.E.2d 1082.) If an exclusion clause is relied upon to deny coverage, its applicability must be clear and free from doubt at the time the insurer is requested to defend because any doubts as to coverage will be resolved in the insured's favor. (*Insurance Co.*, 188 Ill. App. 3d at 662.) It cannot be assumed from the Federal complaint that S&L exercised any degree of control by virtue of its role as engineer, and plaintiff does not demonstrate how otherwise an issue of fact could exist as to S&L's degree of control.

In its cross-appeal, S&L argues that it was entitled to reasonable attorney fees on the bases that plaintiff's amended complaint for declaratory judgment was a vexatious and unreasonable delay in violation of section 155 of the Illinois Insurance Code (Ill. Rev. Stat. 1987, ch. 73, par. 767) and not warranted by existing law in violation of section 2—611 of the Illinois Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 2—611). S&L argues that the amended declaratory judgment complaint failed to address the new causes of action alleged in the third amended Federal complaint and "pretended" that the third amended Federal complaint solely alleged fraud against S&L when it plainly alleged professional malpractice, and that basic research revealed that allegations in the third amended Federal complaint triggered the duty to defend.

S&L also argues that plaintiff made similar misstatements on appeal: (1) falsely stated that count VI failed to allege a contract between Wabash and S&L; (2) ignored count VII for negligence; and (3) pretended that the third amended Federal complaint solely alleged fraud when it alleged professional malpractice. S&L also requests fees for defending this appeal.

Plaintiff responds that S&L's counterclaim sought fees only under section 155. But S&L sought fees under both sections 2—611 and 155 in its motion for summary judgment and for attorney fees. S&L argued in its motion that the amended complaint for declaratory judgment rehashed allegations made moot by the third amended complaint and ignored the new allegations of professional malpractice.

In its reply brief, S&L argues for the first time that the amended complaint for declaratory judgment misstated the allegations of the third amended Federal complaint by: (1) claiming that the Federal complaint only alleged willful and wanton conduct when counts VI and VII alleged breach of contract and negligence, respectively; and (2) claiming that the Federal complaint did not allege that S&L committed a professional act, error or omission when counts VI and VII alleged professional malpractice. S&L also argues for the first time in its reply brief in its cross-appeal that the trial court misinterpreted the application of sections 2—611 and 155. Therefore, these issues are waived. *Harbor Insurance Co. v. Arthur Andersen & Co.* (1986), 149 Ill. App. 3d 235, 240, 500 N.E.2d 707.

Properly on appeal are the issues whether plaintiff should have been sanctioned because its amended complaint for declaratory judgment allegedly failed to address the new causes of action and allegedly ignored that the Federal complaint made other allegations in addition to fraud.

At the time that plaintiff's complaint was filed, section 2—611 provided for sanctions if a pleading was signed in violation of the requirement that the attorney believed after reasonable inquiry that the pleading was well grounded in fact and was warranted by existing law. (Ill. Rev. Stat. 1987, ch. 110, par. 2—611.) And section 155 of the Illinois Insurance Code provided in part:

> "(1) In any action by or against a company wherein there is in issue the liability of a company on a policy or policies of insurance or the amount of the loss payable thereunder, or for an unreasonable delay in settling a claim, and it appears to the court that such action or delay is vexatious and unreasonable, the court may allow as part of the taxable costs in the action

reasonable attorney fees ***." Ill. Rev. Stat. 1987, ch. 73, par. 767(1).

S&L incorrectly contends that plaintiff's amended complaint for declaratory judgment did not respond to counts VI and VII, which were added by the third amended Federal complaint. Paragraphs 46 and 61 of counts IV and V of plaintiff's amended complaint alleged that exclusions applied to count VI. Paragraphs 48 and 63 of counts IV and V of plaintiff's amended complaint alleged that exclusions applied to count VII. Paragraph 72 of count VIII of plaintiff's complaint alleged that plaintiff had no duty to defend S&L as to counts VI and VII because of a deductible provision.

S&L is also incorrect in arguing that sanctions should also be`imposed on the basis that plaintiff ignored that the Federal complaint made allegations in addition to fraud when the Federal complaint alleged professional malpractice. Plaintiff's complaint did refer to the other willful and wanton misconduct alleged in the Federal complaint in addition to the fraudulent conduct allegedly constituting violations of securities laws, RICO, mail and wire fraud statutes, and common law fraud.

In addition, the law on what constitutes property damage is not so clear as applied to this case that plaintiff's complaint for declaratory judgment was unwarranted by existing law. For the same reason, the action was not vexatious or unreasonable under section 155 of the Illinois Insurance Code.

The next issue is whether plaintiff should be sanctioned on appeal for: (1) stating that count VI failed to allege a contract between Wabash and S&L; (2) ignoring count VII for negligence; and (3) ignoring that the Federal complaint made other allegations in addition to fraud.

Although plaintiff's briefs were filed after the effective date of new Supreme Court Rule 375 (134 Ill. 2d R. 375), which governs sanctions for appeals, S&L did not request sanctions under this rule. S&L's request for sanctions under section 2–611 is denied because the section was superseded by Supreme Court Rule 375 as the applicable rule for sanctions on appeal. See *People v. Cox* (1980), 82 Ill. 2d 268, 274, 412 N.E.2d 541 (supreme court rule on matter within court's authority prevails when it conflicts with statute on same subject).

Section 155 of the Illinois Insurance Code does not specifically provide for sanctions for misstatements or omissions in appeals. But even assuming that section 155 may be used to sanction insurance

companies upon appeal, plaintiff's appeal on the whole was not vexatious or unreasonable. Attorney fees are not to be awarded under section 155 simply because an insurer is unsuccessful in supporting its position (*Zak v. Fidelity-Phenix Insurance Co.* (1966), 34 Ill. 2d 438, 444, 216 N.E.2d 113), and a court should look very critically at a request for fees when a substantial question as to coverage was raised (*Automotive Wholesalers v. National Union Fire Insurance Co.* (N.D. Ill. 1980), 501 F. Supp. 1205, 1211). An assertion of a legitimate policy defense supported by case authority cannot be considered unreasonable or vexatious. *Cummings Foods, Inc. v. Great Central Insurance Co.* (1982), 108 Ill. App. 3d 250, 259, 439 N.E.2d 37.

The judgment of the circuit court is affirmed.

Affirmed.

RIZZI and GREIMAN,* JJ., concur.

---

*Justice Freeman heard the oral argument in this case prior to his election to the Illinois Supreme Court; Justice Greiman was substituted and agreed with the changes of the modified opinion.